RECEIVED

AUG 1 1 2005

CLERK, U.S. DIST....
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

FILED

AUG 1 2 2005

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| VELMA PICKENS, AS NEXT FRIEND OF K. H. AND J. H., IN THEIR INDIVIDUAL CAPACITIES AND AS REPRESENTATIVES OF SOPHIA KING'S ESTATE, | § § § § | |
| Plaintiff. | § § | CAUSE NUMBER A04CA340 LY |
| v. | § § | |
| THE CITY OF AUSTIN, THE HOUSING AUTHORITY OF THE CITY OF AUSTIN, and JOHN COFFEY, | § § § § | |
| Defendants. | § § § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiff, VELMA PICKENS, as next friend of K. H. and J. H., files this lawsuit on their

behalf, in their individual capacities and as representatives of Sophia King's Estate against the

City of Austin, the Housing Authority of the City of Austin ("HACA") and John Coffey, and

would show the Court and Jury the following in support thereof:

I.      PARTIES

1.      Plaintiff Velma Pickens was Sophia King's sister and is the non-parent managing

conservator of Sophia King's daughter, K. H., and non-parent joint managing conservator of

Sophia's son, J. H.  Plaintiff brings this action on their behalf in their individual capacities as

statutory wrongful death beneficiaries pursuant to Texas Civil Practices and Remedies Code §§

60.

71.002 et. seq. and in their capacities as heirs at law with standing to assert survival claims on behalf of Sophia King's estate pursuant to Texas Civil Practice and Remedies Code § 71.021.

2.       At the time of her death, Sophia King was a citizen of the United States and resided in Austin, Travis County, Texas.  She had only two children, K. H. and J. H.  Following Sophia's death, there was no need to establish an administration of her estate as she died intestate with no appreciable assets to distribute.  No administration is pending or necessary.

3.       Defendant, the City of Austin, is a municipality organized under the laws of Texas and operates the Austin Police Department.  It has answered and appeared in this lawsuit.

4.       Defendant, the Housing Authority of the City of Austin maintains and manages numerous housing communities in Austin, including the Rosewood Housing Project.  HACA has answered and appeared in this lawsuit.

5.       Defendant, John Coffey, is a member of the Austin Police Department, and has answered and appeared in this lawsuit.

## II.    JURISDICTION AND VENUE

6.       As this case is brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act the Rehabilitation Act, and the Fair Housing Act, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).  Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to consider her state law claim.

7.       This Court has general personal jurisdiction over Officer Coffey as he resides in Texas, over the City of Austin, as it is a Texas municipality, and over the HACA as it operates in Austin, Texas.

Plaintiff's First Amended Complaint - page 2

8.     This Court has specific in personam jurisdiction over all defendants because this cause arises out of conduct, which caused the death of Sophia King at her apartment in Austin, Travis County, Texas, which is within the Western District of Texas.

9.     Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Austin, Texas, which is within the Western District of Texas.

## III.    BACKGROUND

10.    On June 11, 2002, Officer John Coffey shot and killed Sophia King outside of her apartment in the HACA's Rosewood Housing Project.

11.    Sophia was twenty-three years old and the mother of two young children, K. H. and J. H. She was also African-American and mentally ill.

12.    Tragically, these factors contributed to her death, which never would have occurred had the APD and HACA complied with federal law.

### A.     Sophia's Experiences at Rosewood.

13.    Sophia was a tenant of HACA and began living at Rosewood with her children in November 1999.  Upon information and belief, HACA and its employees were well aware that numerous mentally ill individuals lived in its projects or communities.  Yet because of Sophia's mental illness, HACA's employees developed an antagonistic relationship with Sophia, and began to investigate ways to evict Sophia and her children.

14.    As Sophia's relationship with HACA deteriorated, her mental illness also grew worse. For example, she repeatedly threw her possessions into the courtyard, blared her stereo, and

argued with herself. Although HACA documented these events, it refused to make any accommodations to help Sophia handle her mental illness.

15.     Then, in August 2001, one of HACA's employees ran over Sophia's daughter with a maintenance truck.

16.     But while HACA knew that its employee had run over Sophia's child, and knew the incident had further provoked Sophia's paranoia, HACA refused to instruct the employee to stay away from Sophia, or to otherwise help Sophia through the incident. Thus, Sophia became even more paranoid of HACA and believed that HACA's management may actually try to kill her.

17.     Coming on the heels of her daughter's injury, the September 11th bombing and anthrax attacks in Washington, D.C. caused Sophia to completely break down.

18.     In October 2001, Sophia doused herself in detergent cleaner and wandered throughout the Rosewood property, frantically trying to cure herself of "anthrax poisoning."

19.     The APD was called and decided to have her committed on an emergency basis to the Austin State Hospital ("ASH"). Upon information and belief, the process invoked by the officers was called a Peace Officer Emergency Commitment ("P.O.E.C.") and was authorized by Officer George Jackoskie.

20.     At ASH, Sophia was diagnosed with schizophrenia. She also discussed her many conflicts with HACA's staff and her caseworker's notes indicate that the situation was a significant source of stress for Sophia.

21.     While Sophia was institutionalized, her mom, Brenda Elendu, asked HACA to permit her to move into an apartment near Sophia.

Plaintiff's First Amended Complaint - page 4

22.    Brenda made this request so that she could help care for Sophia when she was released from ASH and so that someone who knew her and cared about her would be nearby when she suffered her next psychotic breakdown.

23.    HACA rejected the request.

24.    Nor did HACA make any accommodations to enable Sophia to enjoy the housing benefits it provided.  Among other things, HACA never contacted mental health authorities or family members when Sophia acted out.

25.    Moreover, HACA:

- Failed to provide training to its employees about mental illness;

- Failed to implement policies or procedures regarding mentally ill residents;

- Failed to provide the managers of its "communities" like Rosewood with guidelines concerning contacting the police about incidents involving mentally ill residents;

- failed to maintain a security officer at the Rosewood Project; and

- did not make any accommodations in the way it operated Rosewood that enabled to enable its mentally ill residents to enjoy the housing benefits it provided.

26.    Thus, when Sophia was discharged from ASH, she returned to her apartment at Rosewood and continued to spiral downward.

27.    In the months that followed, Sophia also had numerous problems with her apartment, which eventually required her to enlist the aid of the Austin Tenants Council.

28.    In fact, Sophia became convinced that HACA purposely kept her home in an unsanitary state of disrepair as a form of retaliation.

29.    By June 2002, it was apparent that Sophia was on the brink of another breakdown. Among other things, she had been talking to herself, blaring her stereo, throwing her belongings

onto the lawn, and throwing objects at other residents.  She talked about killing herself and killing Dianne Powell.  Instead of deescalating the situation, working with Sophia's family, or notifying mental heath authorities, however, HACA renewed its quest to evict Sophia.

30.    By Monday morning, June 10, 2002, Sophia was in the midst of another complete psychotic breakdown.  In fact, HACA's apartment manager, Diana Powell, contacted the police to come check on Sophia around 8:00 a.m.

31.    According to Ms. Powell, she told the police that Sophia was mentally ill and that she might hurt herself.

32.    She did not contact Sophia's family or any mental health authorities.

    **B.**    **On June 10, 2002, APD sends an unqualified officer to evaluate Sophia.**

33.    Despite Ms. Powell's warnings, APD did not dispatch a member of the mental health unit or one of its 90 - 100 mental health officers.

34.    Instead, the APD dispatched Jeffrey Domel, an officer without such specialized mental health training, to handle the call.

35.    Before  Officer Domel "evaluated" Sophia, he met with Ms. Powell.  She made him aware that Sophia was mentally ill and might be in danger.  In fact, the call was documented as one involving an emotionally disturbed tenant.

36.    At first, Sophia would not answer the door so Officer Domel went to her back door – which he had no difficulty locating – and knocked again.  No answer.

37.    He returned to the front door and knocked loudly again.  As he did this, he could not help but notice the trash strewn about the outside of Sophia's apartment.  After several minutes,

Plaintiff's First Amended Complaint - page 6

Sophia opened the door slightly.  But Officer Domel only asked Sophia if she was all right and then left.

38.    Amazingly, this was the extent of Officer Domel's evaluation although he knew she was mentally ill and had been warned that Sophia might hurt herself.

39.    Upon information and belief, Officer Domel did not contact the mental health unit or ask APD to send a mental health officer to check on Sophia.

40.    Nor did HACA contact mental health authorities or Sophia King's family.  Rather, upon information and belief, HACA took steps to evict Sophia and exacerbate her condition.

      **C.**    **Sophia's breakdown intensifies and she becomes an obvious danger to herself and to others.**

41.    Following APD's and HACA's failure to accommodate Sophia that morning, her mental condition deteriorated to even more dangerous levels.

42.    She blared her stereo and threw various objects out of her apartment into the courtyard. As a result, the police were called numerous times after 11:00 p.m.

43.    Although APD ignored the first call, it did eventually send an officer to Sophia's apartment.

44.    But while the APD knew that an officer had been sent earlier to check on Sophia's welfare and that she had a long history of mental illness, the APD again failed to dispatch a mental health officer specifically trained to handle mental heath situations.

45.    Instead, it dispatched Officer Kilcollins, an officer without such training.

46.    In addition, upon information and belief, the City's Computer Assisted Dispatch ("CAD") did not provide Officer Kilcollins with information about the numerous calls APD had

Plaintiff's First Amended Complaint - page 7

handled involving Sophia, as it was not designed to show an individual's previous contacts with the police.   Such a system would have alerted Officer Kilcollins that Sophia was emotionally disturbed and that police had been called out earlier on June 10.

47.     In any event, when Kilcollins arrived, Sofia's behavior made it obvious that she was mentally ill  and in the midst of a breakdown.

48.     Kilcollins heard blaring music and saw trash strewn about the courtyard.   And although he knocked loudly enough to wake a neighbor, Sophia did not answer.   In fact, Officer Kilcollins had to knock several times on Sophia's window just to get her to answer.   When she did, she came to the door clothed only in a blanket.

49.     In addition to exhibiting obvious signs of paranoia, she actually threatened to kill Diana Powell, the apartment manager at Rosewood.

50.     Despite these obvious warning signs that Sophia was in the throes of a breakdown and was a danger not only to herself but also to others, Officer Kilcollins did not attempt a P.O.E.C., or contact a qualified mental health officer to evaluate the situation.

51.     Rather, Officer Kilcollins just left.

52.     Later, Sophia repeated her cries for help by turning the music up even more loudly, which led Officer Kilcollins to return.

53.     Again, he did not assess her mental condition and merely threatened to give Sophia a ticket.

54.     Again, Kilcollins ignored evidence of Sophia's paranoia and fear that she would be attacked.

55.     Combined with her earlier threats, Sophia posed a substantial risk of danger to herself and to others.

56.     Yet no mental health officer was contacted and Sophia was not committed under a P.O.E.C.

### D.     Sophia's breakdown reaches the boiling point

57.     Instead, APD left Sophia in a highly volatile, dangerous state to endure her psychotic episode alone and without help.   Consequently, Sophia started to act out again and threw more objects out of her apartment.   Complaints were made to HACA and to the police, who reported that she had been walking around outside with a large knife.

58.     But HACA did not contact mental health authorities or Sophia's family.

59.     Instead, HACA personnel went to Sophia's apartment to confront her.  Upon information and belief, they pounded on Sophia's door and yelled at her before the police arrived and were documenting the items in the yard.  As one would expect, this further antagonized Sophia.

60.     After APD was called, it sent out a bulletin for officers in the area to respond.  Officer Tony Thornton was the first officer on the scene.  Although Thorton was not a member of APD's mental health unit, his report indicates that he was one of APD's certified mental health officers.

61.     When he got there, Sophia was in her apartment and did not have a knife.  According to Thorton, Sophia told him that HACA was always messing with her and that she was tired.  Based on this conversation, Officer Thorton concluded that she needed a P.O.E.C.

62.     Officers Jackoskie and Coffey arrived minutes later.

63.     Officer Coffey was not trained to handle mental health situations but Officer Jackoskie was a certified mental health officer who had actually taken Sophia into protective custody months earlier.

64.     Officer Jackoskie agreed with Officer Thorton's analysis that the situation called for a P.O.E.C.

65.     In an effort to prevent Sophia from leaving the apartment and to protect innocent bystanders, Jackoskie directed Coffey to secure the rear door of Sophia's apartment.

66.     But Officer Coffey failed to secure the back door.  Instead, he positioned himself approximately twenty feet away from the door and observed.  Thus, Officer Coffey secured the area behind Sophia's apartment rather than the door to her apartment.

67.     Officer Coffey also allowed Diana Powell, the HACA apartment manager, to enter the rear courtyard he had secured and take pictures.

68.     As one would expect, seeing Ms. Powell distracted and agitated Sophia and prevented Officers Thorton and Jackoskie from de-escalating the situation.  As a result, Sophia opened the back door.

69.     As Coffey remained 20 feet away from the door, Sophia was able to leave the apartment and approach Powell.

70.     Upon information and belief, the manager fell as Sophia ran towards her.  Sophia was unarmed.

71.     But Officer Coffey panicked, drew his weapon and shot Sophia.

72.     Tragically, the weapon Officer Coffey drew was not a non-lethal Taser but an automatic .40 caliber hand gun.

Plaintiff's First Amended Complaint - page 10

73.    As soon as the bullet struck her body, Sophia fell to the ground gasping for breath.

74.    But Officer Coffey did not give her CPR or try to save her.  Rather, he kept his gun trained on Sophia and watched her die.

75.    In the midst of Sophia's final gasps for life, Officer Thorton went to look for a trauma kit. He searched three police cars but located no trauma kit.

76.    According to witnesses, the officers present at the scene let Sophia writhe on the ground in obvious agony, half-naked, and in view of apartment residents – including children – without attempting CPR for fifteen more minutes.

77.    Had the APD ensured that mental health officers evaluated the mentally ill individuals with whom all of its officers were certain to encounter, Sophia King's death would have been avoided.  Likewise, had Mrs. Powell not breached the secured area behind Sophia's apartment or had HACA properly trained its staff to handle incidents involving the mentally ill or otherwise accommodate her disability, Sophia would still be alive.

### E.    Sophia's death is more evidence that the APD uses force against minorities in shockingly disproportionate and unconstitutional rates.

78.    Sophia's death is also further proof that APD uses deadly and non-deadly force in a shockingly disproportionate fashion against minorities.

79.    As reported in the *Austin American Statesman*, the likelihood that APD officers will use force against an African-American is 100% higher than it is for whites.

80.    In addition, from January 1, 1999 to the present, APD officers shot and killed nine people.  Every single one was black or Hispanic – every single one.

81.    Only one of these individuals allegedly had a gun.  In fact, APD concedes that three of the decedents didn't have any weapon at all.

Plaintiff's First Amended Complaint - page 11

82.    Sophia's allegations increase this number to 4 – meaning that 44% of the minorities killed by APD since 1999 didn't even have a weapon.

83.    APD policymakers, including but not limited to Chief Knee, were well aware of these disparities.

84.    In fact, Toby Futrell acknowledged that the City's data **reflected disparities in the ways minorities were treated in the use of force and use of lethal force.**

85.    And when asked to comment on these disparities, Mayor Will Wynn stated, "[t]he data exposed in [the *Statesman*] series make it clear that we have a problem."

86.    Namely, APD officers shoot and kill minorities at a shockingly disproportionate rate. Needless to say, such a policy is discriminatory and unconstitutional.

87.    In light of the APD's toleration of these disparities, it is unlikely that Officer Coffey would have even fired his weapon if Sophia had been white.

88.    And two innocent African-American children would be able to grow up with their mother.

**IV.    CAUSES OF ACTION**

       **A.    42. U.S.C. § 1983 claim against Defendant Coffey**

89.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

90.    At all times material hereto, Officer John Coffey was acting under color of state law in the course and scope of his duties as a City of Austin police officer.

91.    When Officer Coffey failed to secure the back door to Sophia King's apartment and the area behind Ms. King's apartment, and then panicked and gunned down an unarmed black

woman, he violated Sophia King's rights to be free from excessive force and to equal protection under the law.

92.     As these rights were clearly established at the time of the killing, Officer Coffey's conduct was objectively unreasonable and deliberately indifferent to the rights enumerated above.

93.     And as his conduct proximately caused Ms. King's death, Defendant Coffey is liable under 42 U.S.C. § 1983 for Plaintiff's damages.

**B.     Americans with Disabilities Act ("ADA") Claim Against The City of Austin.**

94.     Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

95.     Sophia King was diagnosed with schizophrenia prior to her death and is a qualified individual with a disability under the ADA.

96.     Likewise, the City of Austin Police Department is a public entity that must comply with the ADA as it is a department and/or agency of the City of Austin.

97.     The APD was aware of its duties to provide services and benefits to mentally ill individuals and purports to provide specific services relating to the treatment, protection, and evaluation of such individuals.

98.     Nonetheless, the APD failed to provide Sophia with these services and/or benefits.

99.     Among other things, the APD failed to implement procedures to ensure that officers trained to handle situations involving the mentally ill would be dispatched to such situations, employed a dispatch system which did not inform officers about previous histories and/or disturbances, actually dispatched officers who were not qualified to evaluate mentally ill individuals, failed to supervise and/or train officers it knew would be dispatched to handle calls

Plaintiff's First Amended Complaint - page 13

involving the mentally ill or that would be dispatching such officers, and failed to provide these officers with non-lethal weapons such as tasers.

100.    In addition, Officers Domel and Kilcollins, who were at all times acting in the course and scope of their employment with the APD, failed to have Sophia committed to a psychiatric facility and failed to notify mental health officers within APD about Sophia's mental condition. Moreover, the officers acted and/or failed to act even though they had knowledge about Sophia's mental disability and her potential danger to herself and to others.

101.    In so doing, the APD and its officers failed to reasonably accommodate Sophia's disability, intentionally discriminated against Sophia on the basis of her disability and/or were deliberately indifferent to her right to receive the services and benefits provided by the APD.

102.    As a direct result of this discrimination, Sophia King was not removed from danger when Officers Kilcollins and Domel were dispatched to Sophia's apartment. In both instances, the scenes were also secure and there was absolutely no threat to the officer's safety. Thus, the conduct alleged herein pertaining to the APD and its officers violated Title II of the ADA, and directly and proximately caused Sophia King's death and Plaintiff's damages.

     **C.      ADA Claim Against HACA**

103.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

104.    Sophia King was diagnosed with schizophrenia and is a qualified individual with a disability under the ADA.

105.    Likewise, HACA is a public entity under the ADA as it provides housing and services related to housing to low-income individuals on behalf of the City of Austin.

Plaintiff's First Amended Complaint - page 14

106.    Nonetheless, HACA failed to accommodate Sophia King's disability and intentionally discriminated against her.  Among other things, HACA failed to train its employees about handling situations involving mentally ill residents, failed to provide security staff at the Rosewood Complex, and failed to implement any guidelines or procedures related to handling situations involving its mentally ill residents.  Moreover, HACA employees failed to permit Sophia King's mother to move to an apartment near her daughter, failed to contact mental health authorities when Sophia acted out and was in danger, confronted her, scared her and exacerbated Sophia's condition when they knew that she was in the midst of a mental breakdown, and antagonized her by taking pictures of her back yard area while police had her surrounded,

107.    In so doing, HACA and its employees failed to reasonably accommodate Sophia's disability, intentionally discriminated against Sophia on the basis of her disability and/or were deliberately indifferent to her right to receive the services and benefits provided by HACA.

108.    And as a direct and proximate result of this discrimination, Sophia King remained in the throes of an acute mental episode without anyone to help her.  Thus, the discriminatory practices of HACA and its employees violated Title II of the ADA and directly and proximately caused her death and Plaintiff's damages

### D.    Rehabilitation Act Claim Against the City of Austin

109.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

110.    Sophia King was diagnosed with schizophrenia and is a qualified individual with a disability under the ADA.

111.    Likewise, the City of Austin Police Department is a public entity that must comply with the Rehabilitation Act  as it is a department and/or agency of the City of Austin and has received federal financial assistance, thus waiving any claim of sovereign immunity.

112.    The APD was also aware of its duties to provide services and benefits to mentally ill individuals and purports to provide specific services relating to the treatment, protection, and evaluation of such individuals.

113.    Nonetheless, the APD denied Sophia these services and/or benefits.

114.    Among other things, the APD failed to implement procedures to ensure that officers trained to handle situations involving the mentally ill would be dispatched to such situations, employed a dispatch system which did not inform officers about previous histories and/or disturbances, actually dispatched officers who were not qualified to evaluate mentally ill individuals, failed to supervise and/or train officers it knew would be dispatched to handle calls involving the mentally ill or that would be dispatching such officers, and failed to provide these officers with non-lethal weapons such as tasers.

115.    In addition, Officers Domel and Kilcollins, who were at all times acting in the course and scope of their employment with the APD, failed to have Sophia committed to a psychiatric facility and failed to notify mental health officers within APD about Sophia's mental condition. Moreover, the officers acted and/or failed to act even though they had knowledge about Sophia's mental disability and her potential danger to herself and to others.

116.    In so doing, the APD and its officers failed to reasonably accommodate Sophia's disability, intentionally discriminated against Sophia on the basis of her disability and/or were deliberately indifferent to her right to receive the services and benefits provided by the APD.

Plaintiff's First Amended Complaint - page 16

117.   As a direct result of this discrimination, Sophia King was not removed from danger when Officers Kilcollins and Domel were dispatched to Sophia's apartment. In both instances, the scenes were also secure and there was absolutely no threat to the officer's safety.  Thus, the conduct alleged herein pertaining to the APD and its officers violated Section 504 of the Rehabilitation Act, and directly and proximately caused Sophia King's death and Plaintiff's damages.

        **E.**       **Rehabilitation Act Claim Against HACA**

118.   Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

119.   Sophia King was diagnosed with schizophrenia and is a qualified individual with a disability under the Rehabilitation Act.

120.   Likewise, HACA is a public entity that provides housing and services related to housing to low-income individuals.   It also has received federal financial assistance, thus waiving its right to sovereign immunity.

121.   Nonetheless, HACA unreasonably denied Sophia the benefit of these services by failing to accommodate Sophia King's disability and intentionally discriminating against her.  Among other things, HACA failed to train its employees about handling situations involving mentally ill residents, failed to provide security staff at the Rosewood Complex, failed to implement any guidelines or procedures related to handling situations involving its mentally ill residents. Moreover, HACA employees failed to permit Sophia King's mother to move to an apartment near her daughter, failed to contact mental health authorities when Sophia acted out and was in danger, and confronted her, scared her and exacerbated Sophia's condition when they knew that she was in the midst of a mental breakdown.

Plaintiff's First Amended Complaint - page 17

122.    Sophia King rented an apartment from HACA at the Rosewood Complex where she lived
with her two children.

123.    In so doing, HACA and its employees failed to reasonably accommodate Sophia's
disability, intentionally discriminated against Sophia on the basis of her disability and/or were
deliberately indifferent to her right to receive the services and benefits provided by HACA.

124.    And as a direct and proximate result of this discrimination, Sophia King remained in the
throes of an acute mental episode without anyone to help her.  Thus, the discriminatory practices
of HACA and its employees violated Section 504 of the Rehabilitation Act and directly and
proximately caused her death.

    F.    **Fair Housing Act Claim Against HACA**

125.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

126.    Sophia King was diagnosed with schizophrenia and is a qualified individual with a
disability under the ADA and/or Fair Housing Act.

127.    Likewise, HACA is a public entity under the ADA and provides housing and services
related to housing to low-income individuals on behalf of the City of Austin.

128.    Nonetheless, in violation of 42 U.S.C. §3604(f) of the Fair Housing Act, HACA failed to
accommodate Sophia King's disability, intentionally discriminated against her, and/or adopted
policies that had a disparate impact on its mentally ill disabled tenants and denied Sophia an
equal opportunity to use and enjoy the housing HACA provided.  Among other things, HACA
failed to train its employees about handling situations involving mentally ill residents, failed to
provide security staff at the Rosewood Complex, and failed to implement any guidelines or
procedures related to handling situations involving its mentally ill residents.  Moreover, HACA

Plaintiff's First Amended Complaint - page 18

employees failed to permit Sophia King's mother to move to an apartment near her daughter, failed to contact mental health authorities when Sophia acted out and was in danger, confronted her, agitated her, scared her, breached a secure police scene meant to protect Sophia, antagonized her by taking pictures of her back yard area while police had her surrounded, and exacerbated Sophia's condition when they knew that she was in the midst of a mental breakdown.

129.    In so doing, HACA and its employees failed to reasonably accommodate Sophia's disability, adopted policies that had a disparate impact on mentally ill individuals like Sophia, intentionally discriminated against Sophia on the basis of her disability and/or were deliberately indifferent to her right to receive the services and benefits provided by HACA and denied her an equal opportunity to use and enjoy her home.

130.    And as a direct and proximate result of the foregoing, HACA violated 42 U.S.C. § 3604(f), and directly and proximately caused Sophia's death and Plaintiff's damages.

G.      **42 U.S.C. § 1983 *Monell* Claim Against The City of Austin**

131.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

132.    The City of Austin had the following policies:

- Dispatching unqualified officers to evaluate and handle situations involving mentally ill individuals;

- Failing to provide officers that encounter minorities and/or the mentally ill with non-lethal weaponry like Tasers;

- Disproportionately using force against minorities and/or the mentally disabled;

- Inadequate supervision and/or training of dispatchers receiving calls involving the mentally ill;

- Inadequate supervision and/or training of officers dispatched to handle calls involving the mentally ill; and

Plaintiff's First Amended Complaint - page 19

- Employing a computer assisted dispatch system that failed to provide officers with information needed to assess situations involving the mentally ill.

133.    Each of these policies was actually known, constructively known and/or ratified by the City of Austin and its policymakers and was promulgated with deliberate indifference to Sophia's rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and federal statutes such as the Americans With Disabilities Act and the Rehabilitation Act.   Moreover, the known and obvious consequence of these policies was that APD officers would be placed in recurring situations in which constitutional violations and/or violations of federal law would result.   Accordingly, these policies also made it highly predictable that the particular violations alleged here would result.

134.    Consequently, these policies were the moving force, of Sophia's constitutional and federal injuries, and caused her to suffer severe damages, namely her death and Plaintiff's damages.

## V.    **CLAIM FOR DAMAGES**

135.    As plead herein, the actions and omissions of Defendants, jointly and severally, deprived Sophia of her civil rights under the United States Constitution and federal law.  These acts and omissions by Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiff and proximately caused and/or were the moving force of the wrongful death of Sophia King, deceased.  Accordingly, Plaintiff asserts claims under the wrongful death and survivorship statutes.

Plaintiff's First Amended Complaint - page 20

136.    In particular, Plaintiff Velma Pickens, as next friend of K. H. and J. H., in their capacities as heirs asserting survival claims on behalf of Sophia King's Estate, has incurred damages including, but not limited to, the following:

- past physical pain and suffering;

- past mental anguish; and

- funeral and burial expenses.

137.    Plaintiff Velma Pickens, as next friend for K. H. and J. H., Sophia's surviving children, in their individual capacities asserting wrongful death claims, has incurred damages including, but not limited to, the following:

- past and future mental anguish; and

- past and future loss of companionship, society, services, and affection with their mother.

## VI.    CLAIM FOR PUNITIVE DAMAGES AGAINST HACA

138.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

139.    As HACA's conduct was intentional and/or was recklessly indifferent to Sophia's federally protected right under the Fair Housing Act, Plaintiff also seeks punitive damages against HACA.

## VII.    PRAYER FOR RELIEF

140.    To right this horrible injustice, Plaintiff requests that this Court:

      a.    Award compensatory damages to Plaintiff and against the Defendants, jointly and severally;

      b.    Award and allow Plaintiff costs and attorneys fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. §12205, 42 U.S.C. §3613(c)(2) and/or all other applicable statutes;

    c.      Award punitive damages against HACA;

    d.      Award prejudgment and post-judgment interest at the highest rate allowable under the law; and

    e.      Award and grant such other just relief as the Court deems proper.

Respectfully submitted,

WHITEHURST, HARKNESS, OZMUN &
  BREES, P.C.
1122 Colorado Street, 24th Floor
P. O. Box 1802
Austin TX  78767
512/476-4346
512/476-0018 Facsimile

By_____
    SCOTT OZMUN
    State Bar No. 15392740
    JEFF EDWARDS
    State Bar No. 24014406

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

      By my signature above, I hereby certify that a true and correct copy of the foregoing document was served on opposing counsel on the ___11th___ day of August, 2005, via certified mail, return receipt requested, as follows:

Kevin W. Cole
COLE & POWELL, P.C.
400 West 15th Street, Suite 304
Austin TX  78701
    ATTORNEYS FOR DEFENDANTS OFFICER JOHN COFFEY AND CITY OF AUSTIN

Laurie Eiserloh
David Allan Smith
Assistant City Attorney
CITY OF AUSTIN-LAW DEPARTMENT
114 West 7th Street, Floor 5-A
Austin TX  78701
    ATTORNEYS FOR DEFENDANTS OFFICER JOHN COFFEY AND CITY OF AUSTIN

James Byrom
James Ewbank
EWBANK & BYROM, P.C.
221 West 6th Street, Suite 900
Austin TX  78701
    ATTORNEYS FOR DEFENDANT HOUSING AUTHORITY OF THE CITY OF AUSTIN